James WHITING, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

No. 5811.

United States Court of Appeals First Circuit.

Heard Oct. 2, 1961.

Decided Nov. 24, 1961.

Jerome Medalie, Boston, Mass., with whom Julian Soshnick, Boston, Mass., was on brief, for appellant.

William J. Koen, Asst. U. S. Atty., Boston, Mass., with whom W. Arthur Garrity, Jr., U. S. Atty., Boston, Mass., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal by the appellant from a judgment of conviction on six counts of an indictment arising under 26 U.S.C. § 4705(a) and 21 U.S.C.A. § 174, relating to the sales of heroin to a government agent on three separate occasions at Springfield, Massachusetts.

The trial originally estimated by the attorneys for the government and appel-

lant to last some three days consumed ten trial days and a record of some 1045 pages on relatively simple issues, apparently owing to conspicuous redundancies on the part of both counsel and the court's allowance of frequent lapses into obviously irrelevant matters.

The major testimony relating to the sales came from a government agent and the appellant himself. While there was a basic similarity in this testimony, there was a direct conflict on most of the material points concerning the events which actuated the appellant's deeds.

The Government presented evidence that on May 3, 1959 an agent of the Bureau of Narcotics regularly assigned to the New York office, was sent to Springfield, Mass. This agent testified that he went to the appellant's apartment and was admitted by the appellant's wife. After introducing himself, he testified that he informed the appellant's wife that on the previous day and in the company of a former friend of the wife—a certain Carol Brewer—he had visited their home but found no one present. In the guise of a tobacco worker from Connecticut, he engaged in a conversation with appellant and his wife about persons and places in Hartford, the former home of appellant's wife. He testified that almost immediately thereafter he broached the subject of obtaining heroin, that there was a brief discussion concerning prices and thereupon the appellant stated that he would contact "his man." [1] When a telephone call failed to reach "his man", the appellant indicated that he would take the agent to a location where this individual would likely be available. Thereupon the two left Whiting's apartment, proceeded to certain premises on an adjacent street and entered therein. Unable to locate the alleged contact at this address, the pair proceeded to another apartment house on another neighboring street. Here, following some further discussion relative to price, the agent gave the appel-

lant $10.00. The latter ordered the agent to remain on the second floor of the apartment house while he proceeded to an apartment on the third floor. When he returned, he handed the agent two packages, later proved to contain heroin.

On two subsequent occasions, June 28 and July 10, the substance of the above transaction was repeated with the agent giving money to the appellant, the appellant—always out of sight of the agent—obtaining the heroin from a third party, and thereafter, delivering it to the agent. On each occasion, the appellant apparently obtained the narcotics from a different source. The agent testified that when Whiting was arrested he made the admission that he had made some profit from the transactions.

Appellant testified and set up the defense of entrapment. He readily acknowledged that he had obtained the narcotics for the government agent on each of the three different dates. He testified that the agent initially ingratiated himself by pretending to have met the appellant's wife on a previous occasion through a mutual friend. According to appellant, the agent said that he was attempting to obtain narcotics for a sick girl friend who was in urgent need of them. He told the appellant that his car had broken down in Springfield, that he was low on funds, that he had no other friends or acquaintances in Springfield and in view of these facts he was seeking help or assistance from the appellant. Appellant, according to his own version of the facts, offered to help the agent with his car but the latter declined stressing the fact that his most urgent need was narcotics for the sick girl friend. He testified that at first he refused but upon persistent urgings by the agent that his girl friend was "sick from the narcotic habit" he finally agreed to help him obtain the drug.[2]

Appellant further admitted that he had been personally addicted to the use of narcotics in the past but had finally suc-

---

1. There was testimony that in the argot of the narcotics traffic "my man" may be roughly translated as "my partner".

2. In rebuttal the agent denied that he had ever made reference to a sick girl friend.

ceeded in breaking the habit some months prior to the date of the first transaction. He steadfastly maintained that during the period of his addiction he had been exclusively a "user" and not a "pusher" or seller. He testified that he had never before obtained narcotics for anyone but himself, that he derived no profit whatsoever from the instant transactions and that he had no contact man or partner. He stated that in each of the transactions here in issue the narcotic was obtained from a different source—whichever source was then available at the time of his inquiry and search. In short, he sought to present the picture of a samaritan who was impelled to forbidden conduct by the coaxing, entreaties and persuasion of a government agent.

At the close of appellant's testimony raising the defense of entrapment, the Government reopened its case with rebuttal evidence tending to negate the defense. It is the admission of certain Government evidence at this juncture which presents appellant's principal contention on this appeal.

In rebuttal, the Government called Captain Collins of the Bureau of Crime Detection of the Springfield Police Department. Over the strenuous objection of the appellant, Captain Collins was allowed to testify that he had received four or five anonymous telephone calls to the effect that the defendant was selling and using narcotics. He later repeated this testimony by saying that the persons who telephoned him said that the defendant was a "source and user of narcotics." The Captain was allowed to testify that the telephone calls also indicated that the defendant had made frequent trips to New York City for the purpose of obtaining narcotics.

On cross examination Captain Collins admitted that the callers did not identify themselves, that he did not know if they lived in the Springfield area, nor whether they even knew the defendant.

Another Government witness in rebuttal was John Waddock, a Government narcotics agent. Again, over the objection of appellant, the agent was allowed to testify that one Carol Brewer furnished to him the names of approximately twelve to fourteen persons " * * * who were engaged in the narcotics traffic," one of whom was the appellant. Upon cross examination, this witness admitted that Miss Brewer—his asserted informant— did not tell him when she had last seen the appellant, whether in 1958 or 1959, whether she ever personally knew the appellant, whether she had ever seen the appellant in Springfield, or, indeed, whether she had herself ever resided in Springfield.

A further Government witness in rebuttal was James B. Kane, a sergeant in the Springfield Police Department. Once again over the repeated objections of the appellant, the court allowed Sergeant Kane to testify that one Lewellyn Dobson had told him that the appellant was selling and using narcotics. Upon cross examination, Sergeant Kane admitted that Lewellyn Dobson—the ostensible source of his information—was in police custody at the time of the conversation, and that the conversation took place at the police station. It further appeared that Sergeant Kane was unaware of whether Dobson had any personal knowledge of the appellant.

Throughout the foregoing testimony, appellant continually argued that such testimony was patently inadmissible as hearsay. The court while overruling appellant's objections and admitting the evidence continually admonished the jury that it was being admitted for limited purposes. Representative of these admonitions is the following statement of the court to the jury during the testimony of Captain Collins concerning the information derived from the anonymous telephone calls.

"The jury is to consider such testimony as may be obtained—may be admitted from this witness only for the purpose of determining if Peterson, the agent, had good cause to believe that the defendant was engaged in illegal activity involving narcotic drugs prior to May 3, 1959. It is to

be limited to showing that Whiting had a predisposition to commit offenses involving the illegal traffic in narcotic drugs, and is being received in evidence—those answers which will be admitted in evidence at all—in view of the defense which is being relied upon by Whiting, that he was entrapped by the government agent into committing the alleged offenses charged in the Indictment."

Similar cautioning instructions were given by the trial judge to the jury concerning the testimony of Agent Waddock and Sergeant Kane.

After both sides had rested and before the charge, the court ordered struck from the record the testimony of Sergeant Kane and Agent Waddock relative to what had been told them by the informants Brewer and Dobson and instructed the jury to disregard it. However, the district judge did not strike the testimony regarding the anonymous telephone calls and Captain Collins' testimony on this matter went to the jury. Here on appeal, appellant argues that the court committed error in admitting into evidence the hearsay testimony of the three rebuttal witnesses to the defense of entrapment. He further argues that this testimony was so pregnant with prejudice that it could not be cured by an instruction to the jury to disregard it.

Appellant is correct in characterizing the rebuttal testimony of Captain Collins, Agent Waddock and Sergeant Kane as hearsay evidence of the most obvious and highly prejudical variety. The dispatchers of the anonymous calls, the alleged informants, Miss Brewer and Dobson— the putative sources from which the three rebuttal witnesses assertively derived their information—did not testify. It is obvious that in the ordinary criminal case it would scarcely have been open to the Government to attempt to establish the appellant's bad reputation by testimony of this nature. But we are urged by the Government that the fact that this is a criminal case wherein the defense of entrapment has been raised makes a difference; a difference so material as to render the admission of this evidence proper.

In support of this position the Government initially cites us to certain language in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), where the defense of entrapment was first considered by the Supreme Court. There the Court recognized that this defense would prevail if it could be found that the pertinent criminal act was "the product of the creative activity" of law-enforcement officials. Id. at 451, 53 S.Ct. at 216. In establishing its much-cited "origin of intent" test the Court noted that the "predisposition and criminal design of the defendant" would be relevant factors in assaying the genesis of the proscribed act. Further, the Court stated that once the issue of entrapment was raised both the actions of the Government authorities and those of the defendant should be subjected to the most critical gaze. "The government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." Id. at 451, 53 S.Ct. at 216.

When the Court next considered the issue of entrapment in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848 (1958), the above cited language was adopted by the Court with Chief Justice Warren stating that: "On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence." [citing Sorrells] 356 U.S. 369 at 373, 78 S.Ct. 819 at 821.

Here the Government maintains that it was but directing the "searching inquiry" twice sanctioned by the Supreme Court when it elicited the hearsay accounts now at issue and it argues that the district court's action in admitting

this evidence, under limiting instructions, was consonant with the same directive. Appellant, on the other hand, reminds us that while the search thus sanctioned was to be "searching", this adjective was preceded in the same sentence by another of at least correlative rank— the term "appropriate". Accordingly, he argues that it would be distinctly inappropriate to allow the Government to establish a defendant's "predisposition" by hearsay evidence of the kind involved here.

Since the Sorrells decision, whenever a defendant raises the defense of entrapment, the Government has usually sought to establish the proclivity of the defendant to commit crimes of the general type at issue. The cases show it is usually an effective rebuttal to the defense if it can be demonstrated, in the words of Judge Learned Hand "that the accused was ready and willing to commit the offence charged, whenever the opportunity offered. In that event the inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose." United States v. Sherman, 200 F.2d 880, 882 (2 Cir.1952).

Conceding then, as we readily do, the propriety of the Government's exploration to determine whether a particular defendant is an "otherwise innocent person" or one with an illicit preexisting purpose, the question presented here— apparently left open by the Supreme Court and not considered before in this Circuit,—is the character or method of proof which the prosecution may utilize in seeking its objective.

■ It is now well established that one of the methods by which the Government can show a predisposition or criminal design on the part of the accused is by evidence of previous convictions. United States v. Sherman, 2 Cir., 200 F.2d 880 (1952); United States v. Becker, 2 Cir., 62 F.2d 1007 (1933). It has been said the former offenses need not be precisely the same as that presently charged so long as they are of a sufficiently similar character as to support an inference that the defendant had the requisite general intention. United States v. Sherman, supra, 200 F.2d at 882. Moreover, this evidence may embrace misdemeanors as well as felonies. Carlton v. United States, 9 Cir., 198 F.2d 795 (1952). While permitting this type of proof undoubtedly runs grave risks of introducing collateral issues,[3] thus beclouding the particular offense with which the accused is presently charged, at least where the dissimilarity in the conduct compared is minimal, it has a certain logical solidity tending to show that the instant offense was but another instance in an established pattern of criminality and would thus be relevant to the question of predisposition.

To be sure this method is subject to the defects inherent in any retrospective appraisal of past conduct but it is an item susceptible of direct proof and, to repeat, its propriety is now too well established to permit of doubt at this late date. Similarly, by a parity of reasoning, where the defense of entrapment is raised, the Government should be permitted to introduce any competent evidence of a continuing course of criminal activity or misconduct, whether previously punished or not, which could be licitly attributable to the defendant and would tend to logically demonstrate that ready disposition antithetical to an entrapment. Moreover, focusing on the circumstances surrounding the particular act at issue, the readiness and celerity with which a defendant comported with the government overtures, his demonstrable orientation to and familiarity with the relevant course of activity and his access to the sources of the pertinent market place would surely

---

3. In both Sorrells and Sherman, a minority of the Court felt that the introduction of this type of evidence would, as a practical matter, withdraw the defense from a defendant with a tainted background.

be relevant indicia that he was not among the uninitiated in the forbidden traffic. Accordingly these facts—to the extent susceptible of direct attribution—would be entirely legitimate weapons for the Government to utilize in waging its counter offensive to negate the defense of entrapment and to show predisposition. In varying degrees these factors were present in the instant case and were made the subject of argument by the Government. However, the Government went further.

Here the inquiry into the accused's past conduct disclosed no criminal convictions for the appellant had none. Despite a protracted surveillance of the accused by police authorities, apparently no discernible course of criminal activity of any sort was unearthed, the instant transactions apart. Consequently, lacking these overt manifestations, the Government, as seen, sought to establish the defendant's "predisposition,"—a term which apparently embraces both the character and intention of the defendant, Accardi v. United States, 5 Cir., 257 F.2d 168, 171, cert. denied, 358 U.S. 883, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958)—by general reputation.

■ The Government argues that proof of general reputation is admissible to demonstrate predisposition and there is language in the cases to support this. (See, e. g., Justice Roberts concurring in Sorrells). However, acceptance of this hypothesis does not resolve the problem facing us here for it is one thing to say that proof of reputation is admissible to show character and quite another to say that this reputation may be established by hearsay evidence of the type involved here. It is fundamental that to qualify a witness as competent to give testimony concerning a defendant's character and reputation in the community it is usually required that there be a showing that the statements uttered by the witness are representative. It is generally required that the witness must show that he lives or works in a given community and is familiar with the reputation of the defendant. In short, there must be some demonstrable basis evincing the competence of the witness to give his opinion. See generally, Wigmore on Evidence, 3d Ed. § 191, §§ 1610–1616; see also Deschenes v. United States, 10 Cir., 224 F.2d 688 (1955); Riebe v. United States, 9 Cir., 82 F.2d 564 (1936); Minkow v. United States, 4 Cir., 5 F.2d 319 (1925). Here it is patent that neither the testimony of Captain Collins, Agent Waddock nor Sergeant Kane would qualify under the usual rules regarding the competency of a reputation witness. All were allowed to tell the jury that the defendant was a vendor of narcotics yet none knew this of his own personal knowledge. Moreover, from all that appears from the record this hearsay may well have been compounded. In the case of the testimony of Captain Collins, he admitted that he had no idea whether his callers ever personally knew the appellant, or were even from the Springfield area. Similarly, in the case of the testimony of Agent Waddock and Sergeant Kane, there was no discernible showing that their informants knew the appellant, had seen him in the Springfield area or, finally, whether their information was in any wise first hand. However, this testimony was admitted as relative and probative of the appellant's predisposition to commit narcotic offenses. Stripped to its essentials the argument of the Government is quite simply that hearsay testimony is admissible to show the predisposition of the appellant. Yet beyond stating that this practice is sanctioned where entrapment is raised, the Government has not offered, nor can we perceive any sound reason, save that of expedience, why this should be. If Dobson and Miss Brewer were competent to testify as to the general reputation or character of the appellant and thus to his predisposition, it would seem a matter of elemental fairness that they should be called by the Government to so testify in open court.

In further support of its position the Government relies on a line of cases of which Washington v. United States, 5 Cir., 275 F.2d 687 (1960) and United States v. Siegel, 8 Cir., 16 F.2d 134

(1926) are representative and which it is argued, sanctions the procedure here. In both cases, Government authorities were allowed to testify as to hearsay reports which they had received from third parties and which formed the basis of their actions in proceeding to provide opportunity for the commission of the crimes there involved. In Siegel it was stated that "If hearsay testimony is not a sufficient basis for a reasonable belief on the part of the officers charged with the enforcement of the Narcotic Act, it will be seldom, if ever, that they can use a decoy, without such use constituting an unlawful entrapment." Id. at 137.

And in Washington, the following statement appears:

"Washington's final complaint is that the court erred in permitting Robinson to testify, over objections, that he had been told by several people that he could purchase narcotics from Washington. There is no merit in this contention. Once the defense of entrapment has been raised, it is proper to inquire into the reputation of the defendant to determine his predisposition to commit the offense or to inquire into the reasonableness of the officer's conduct. [citing cases] The trial judge properly instructed the jury to consider such testimony only for the limited purpose of determining if Robinson had good cause to believe that Washington was trafficking in narcotics. There was no objection to the charge. The testimony was properly admissible for this limited purpose." Id. 275 F.2d at 690.

In these and allied cases the hearsay evidence is generally spoken of as showing good cause or forming a reasonable basis for the authorities proceeding against a particular defendant by decoy or stratagem. We believe it to be a sound principle and one borne out by the cases that before a policeman may act against an individual by artifice that he have some rational basis for taking such action. The cases relied on by the Government apparently take the view that evidence tending to show the basis for the authorities' action is not hearsay because not offered testimonially, despite its highly prejudicial character. In line with these cases if we were to concede, a question we need not decide, that evidence of such an insubstantial character as the "anonymous phone calls" might be paraded before a jury in an avowed attempt to demonstrate good cause for setting out to ensnare the appellant, this assuredly is not to say that this same evidence is competent to portray a defendant's predisposition to commit the offense. And yet under the instructions of the district judge, this evidence was admitted to show predisposition as well as good cause.[4] It is one thing to conduct an inquiry into the appellant's past conduct and elicit the fruits of this search by competent evidence to show evil proclivities. It is quite another to attempt to accomplish this same objective by lofting into the jury box the basis of officials' suspicion, however evidentiary ephemeral these latter may be.

■ Here, at least, in the case of the anonymous phone calls, it could well be said that the evidence " * * * was so indefinite that it gave the defendant no chance or opportunity to refute it. It specified no person who made any of the complaints to which [the agent] testified. It specified no time when, place where, or circumstances surrounding any such complaints which could give the defendant any chance or opportunity to refute or contradict the testimony regarding such complaints, * * *." Mattson v. United States, 8 Cir., 7 F.2d 427, 428 (1925). We believe that to the extent that testimony of this character might be utilized by a jury to assay the appellant's predisposition to commit narcotic offenses, its

---

4. To the extent that these cases might be construed as indicating that the reasonable cause of the officers' suspicions, where hearsay is involved, could be used as evidentiary of the accused's predisposition rather than as a prerequisite to the procedural police practice involved we would disagree.

judgment would be but a surmise from the shadows—a guess in the dark. Accordingly, we conclude that the admission of hearsay evidence of the character here in issue to show the predisposition of the appellant was highly prejudicial error.

The question remains whether the action of the district court in striking the testimony of Agent Waddock and Sergeant Kane removed this taint.

We believe that the impact of this testimony which purported to show that the appellant was a "pusher" of narcotics clearly went to the heart of this case. This coupled with the fact that the court did not strike the testimony of Captain Collins with regard to the anonymous hearsay accusations of the appellant precludes us from saying with sufficient assurance that the judgment below was not substantially infected by the court's error. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

█ One other contention of appellant merits discussion. On direct examination, the defendant was asked by his counsel why he purchased the narcotics in question.

Q. "Now will you tell this Court and Jury why you went up to Hank's apartment that evening to obtain narcotics for Agent Peterson?"

The prosecution objected and the court sustained the objection, making the following comments:

The Court: "I will sustain the objection to that.. Are we interested in his mental processes? I suppose we are interested in finding out what he did and what he said, and his *rationalization* as to why he did a certain act would not be helpful to us, would it?" (Emphasis supplied.)

Appellant argues that his motives in purchasing narcotics for the government agent were clearly relevant to the defense of entrapment. He urges that the determination of whether he was impelled to perform the illegal act by an unconscionable play on his sympathies or by forceful persuasion was central to the defense of entrapment.

We are not clear why the court did not permit defendant to answer why he made the sales in question, since his state of mind was relevant to the issue of entrapment. However much the court may think such testimony "rationalization," this does not make it inadmissible. Wigmore, Evidence (3d ed. 1940) § 581. Defendant's other evidentiary contentions, if meritorious, are unlikely to arise again in the same context. His motion for judgment of acquittal is entirely without merit.

The judgment of the district court is vacated, the verdict is set aside and the case is remanded for a new trial.