STATE

v.

**Alan Jimmie JONES.**

**No. 78–219–C.A.**

Supreme Court of Rhode Island.

July 3, 1980.

Dennis J. Roberts, II, Atty. Gen., Stephen Lichatin, III, Sp. Asst. Atty. Gen., Chief, App. Division, for plaintiff.

Ira L. Schreiber, Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is a criminal appeal in which the defendant was tried before a jury in the Superior Court for two violations of G.L. 1956 (1968 Reenactment) § 21–28–4.-01(A)(2)(a), as enacted by P.L. 1974, ch. 183, § 2, unlawful possession with intent to deliver and unlawful delivery of a controlled substance, heroin, listed in § 21–28–2.08, schedule 1(c)(10).[1] At trial the defendant did not seriously contest that he committed the crimes charged but contended that he was the victim of a government entrapment that expiates his crimes.

According to defendant's version of events, two weeks before the date of the crime, Lonnie Wilkerson, who unbeknown to defendant was a government informer, first approached him in a Providence barroom to suggest the idea of delivering heroin to Wilkerson's girlfriend. Although defendant had known Wilkerson at work and had visited Wilkerson's house three or four times, he was reluctant to do Wilkerson this favor. In the days that followed, Wilkerson, whom defendant described as an exprizefighter, "a forceful man," standing six foot three inches tall, weighting 235 to 245 pounds, and commanding from him both respect and fear, persisted another three or four times in his request. Unless defendant made the sale, Wilkerson said, his girlfriend from Boston would demand a lower price for the drug because she and Wilkerson had already conducted a number of sales.

On March 7, 1976, defendant went to Wilkerson's house where, dialing from a number he found in a book, Wilkerson introduced defendant by phone to his Boston girlfriend, Patricia. The defendant was unhappy because he "never dealt in drugs of that nature at all," yet he agreed to sell heroin to the woman the next day. Wilkerson arranged to meet defendant on March 8 prior to the transaction.

According to defendant's approximation, on March 8, 1976, one-half hour before the time set for the sale at Wilkerson's house he received from Wilkerson a Band-Aid box that Wilkerson opened saying that the packages in the box contained heroin. Wilkerson directed defendant to sell the entire contents for $1,200, or any portion thereof for a proportional price. He told defendant that he was going to pick up Patricia and that they would meet him at the Moshassuck Medical Center parking lot.

At "supper time, six or so," according to defendant's estimate, defendant rendezvoused with Wilkerson and Patricia at the Medical Center lot; however, feeling uncomfortable because he "had never been in that position before," he suggested that they conduct their sale across the street in the Marriott Hotel parking lot. At the new location Patricia alighted from Wilkerson's car, entered defendant's truck, and purchased one of the six packets of heroin from the Band-Aid box for $200. Although defendant and Patricia had a brief conversation, defendant testified at trial that he did not know whether the voice of the Patricia he met on March 8 was the same as the voice he had spoken to by telephone the preceding day.

After delivering the heroin defendant returned to Wilkerson's house where he waited fifteen to twenty minutes for Wilkerson to arrive. When Wilkerson appeared defendant handed him the Band-Aid box and the $200, and, without conversation, Wilkerson placed a $50 bill in defendant's shirt pocket.

1. General Laws 1956 (1968 Reenactment) § 21–28–2.08 schedule 1(c)(10), as enacted by P.L. 1974, ch. 183, § 2, has since been amended by P.L. 1979, ch. 168, § 1.

The state's account of the facts differ from defendant's version in two important respects. Of particular significance to defendant's entrapment claim, two government agents testified that there was never any plan to have the informer provide defendant with the heroin prior to the delivery or receive the remaining contraband and the money after the sale. The agent who purchased the heroin from defendant, Patricia Meade, testified that defendant was to supply the drug and denied, moreover, that she spoke with defendant by telephone the day before the delivery. Agent Herbert Lemon testified that Wilkerson called him at 3 p. m. on March 8, 1976, told him that he had arranged a "buy" from defendant earlier in the day, and specified the time, place, and cost of the "buy." Agent Lemon recalled that he then telephoned Agent Meade in Boston to secure her assistance in the operation.

The agent's testimony concerning the timing of events also contradicted defendant's estimation. Both agents recalled that they met Wilkerson at the Providence police department at 5:30 p. m. on March 8, 1976, and that the transaction occurred one hour later, between 6:30 p. m. and 6:50 p. m. They concurred that at 7 p. m. they conducted a field test of the substance in a parking lot on Francis Street in Providence in the presence of Wilkerson. According to them, Wilkerson did not leave their company until 7:45 p. m. when he drove off without saying where he was going.

The jury returned guilty verdicts on both counts. The defendant filed an appeal in this court, alleging, *inter alia*, that the prosecutor employed an improper method of disproving the entrapment defense defendant relied on.

■ The defendant claims that the facts adduced at trial establish a case of entrapment. Entrapment, an affirmative defense, occurs when a government agent, or one working in cooperation with him, induces an "unwary innocent" to commit an offense. *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848, 851 (1958). We have held that once a de-

fendant adduces evidence that he was induced to commit the offense, he then raises the issue of his predisposition to commit the crime charged. *State v. DeWolfe*, R.I., 402 A.2d 740, 744 (1979). It therefore follows that a defendant who relies on the defense of entrapment will usually admit that he has committed the crime charged but will deny that the criminal design originated with him. Instead, he will claim that the government agents by their conduct induced him to commit the crime. *See State v. Gilman*, 110 R.I. 207, 220, 291 A.2d 425, 433 (1972) (quoting Perkins, *Criminal Law*, Ch. 10, § 9, at 1031 (2d ed. 1969)).

■ In *Gilman, supra*, we held that the defendant did not submit any evidence of government inducement that would entitle him to instructions on entrapment. *Id.* at 222–23, 291 A.2d at 434. Entrapment is raised, however, when the defendant satisfies his threshold responsibility to present some evidence of government conduct that created a risk of persuading an unpredisposed person to commit the crime. *See, e. g., United States v. Burkley*, 591 F.2d 903, 914 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. Martinez-Carcano*, 557 F.2d 966, 970 (2d Cir. 1977); *cf. Lopez v. United States*, 373 U.S. 427, 434–35, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462, 468 (1963) ("some showing" raises issue of entrapment). The prosecutor, once the defense of entrapment is raised, must prove beyond a reasonable doubt that the defendant acted not in response to government inducement but because he was predisposed to commit the crime. *See, e. g., United States v. Burkley*, 591 F.2d at 916; *Notaro v. United States*, 363 F.2d 169, 175 (9th Cir. 1966).

■ In an entrapment case, the issue of predisposition is an important question, and unless the state can overcome by proof beyond a reasonable doubt the evidence of inducement with evidence of predisposition, the defendant must stand acquitted. *United States v. Burkley*, 591 F.2d at 915. Thus, in seeking to be excused from criminal culpability, the defendant who alleges that the government manufactured the

criminal design into which he was drawn invites an "appropriate and searching inquiry into his own conduct and predisposition" to commit the alleged offense. *Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413, 422 (1932); *see State v. DeWolfe*, 402 A.2d at 744.

The defendant before us argues that the cross-examination of him by the state was not "an appropriate and searching inquiry" into his predisposition. Predisposition has been defined as a state of mind which readily responds to governmental inducements to commit the proscribed act. *United States v. Burkley*, 591 F.2d at 916; *Hansford v. United States*, 303 F.2d 219, 222 (D.C. Cir. 1962). Predisposition should therefore be proven by reliable and probative evidence. For evidence to be reliable and probative proof of predisposition, it must have a direct bearing on whether defendant was of a disposition that readily responds to inducement by government agents or informers at the time he was subjected to the inducement. *See* Park, *The Entrapment Controversy*, 60 Minn.L. Rev. 163, 272 (1976); *cf. United States v. Johnston*, 426 F.2d 112 (7th Cir. 1970) (exclusion of hearsay evidence); *DeJong v. United States*, 381 F.2d 725 (9th Cir. 1967) (exclusion of irrelevant convictions).

The defendant claims that the trial justice abused his discretion to limit the prosecutor's cross-examination of him in two ways: (1) by allowing the state to introduce evidence that defendant had been indicted for delivering cocaine, and (2) by allowing the prosecutor to pose hypothetical questions to defendant that were not based upon any facts adduced at trial.

In attempting to establish Jones's predisposition to commit these drug offenses, the prosecutor questioned Jones about a nineteen-month-old indictment, numbered 75–309, charging Jones with the unlawful delivery of cocaine to Detective Daniel Rodriguez of the Providence police department. Although the prosecutor did not offer the indictment itself into evidence, he assured the trial court that he had the court file of indictment No. 75–309 at counsel table.

Further, in order to disprove defendant's submission to the duress exerted by the informant, Wilkerson, the prosecutor posed a number of hypothetical questions, asking Jones whether he would commit various crimes, dissimilar in character to the charge before the court, at the insistence of Wilkerson or would sell heroin to a minor at the behest of the informant.

The following questions gave rise to defendant's present claim on appeal:

"Q  The question, Mr. Jones, is: Have you, in fact, in the past dealt in cocaine?

"*  *  *

"A  In the past, I have been charged once with possession of cocaine, but I have never dealt with or been convicted of its use or distribution.

"Q  Well, Mr. Jones, on January 30 of 1975—by the way, strike that. By the way, do you know where the LaCava Club is in Providence?

"A  Yes, sir.

"Q  Where is it, sir?

"A  Did I say—did I say I had never been charged? I've been charged, but I've never been convicted of that particular—

"Q  But, sir, what I am asking you is, do you know where the LaCava Club is?

"A  Yes, I do.

"Q  Do you know a Daniel Rodriguez?

"A  Yes, I do know Daniel Rodriguez.

"Q  On January 30, 1975, did you, in fact, sell to Daniel Rodriguez, an agent of the Providence Police Department,—cocaine for the sum of $450.?

MR. SCHREIBER: I'll object.

"A  No, sir, not at all.

THE COURT: Objection overruled.

"A  Not at all. That is false information.

"Q  Well, you were, in fact, arrested on that charge, Mr. Jones, weren't you?

"A  I think you have your figures wrong, Mr. Leavey.

"Q  What was the amount that you sold the cocaine for?

"A   I didn't sell any cocaine at all.

"Q   What are the 'figures'?

"A   There are no figures involved.

"Q   Well, how do I have the figures wrong?

MR. SCHREIBER: I will object to this line of questioning, judge.

THE COURT: Objection overruled.

"A   Excuse me, what was your last question?

"Q   Forget it, Mr. Jones. You were arrested on February 25th of 1975; is that correct?

"A   Yes, sir.

"Q   And you were indicted by a Grand Jury?

"A   Right.

"Q   For sale of $450. worth of cocaine to Daniel Rodriguez, an agent of the Providence Police Department?

"A   That is erroneous, sir.   That is wrong.

"Q   What is wrong about it, sir?

"A   $450.

"Q   What was the amount, sir?

"A   There was no transaction.   There was no amount.

"Q   You were indicted, were you not?

"A   I was indicted.

"Q   You do recall that; is that correct?

"A   Yes, sir.

   *     *     *     *     *     *

"Q   After being indicted, sir, did you appear in Court on April 3, 1975 to be arraigned on an Indictment charging you with delivery of cocaine to Daniel Rodriguez—and I will show you the Court file.

"A   I was charged with delivery, but I never sold anything to Daniel Rodriguez.

"Q   Is that were I was wrong?

"A   Yes.

"Q   With the amount of money, but you were charged with delivery of cocaine to Daniel Rodriguez; is that right?

"A   I was charged with possession with intent to deliver, but not with delivery.

"Q   Did you get a copy of the indictment, sir,—

"A   Yes, sir.

"Q   —when you were arraigned in Court? I'm asking you if that is * * * a copy of the Indictment?

MR. SCHREIBER: Objection, judge, I don't see the relevancy of the witness reading the Court file to determine what the Indictment says.

THE COURT: Objection overruled.

"Q   Does that now refresh your memory as to whether or not you were charged with delivery of cocaine to Daniel Rodrigues?

"A   I was charged with delivery, right. That's right.

"Q   Now, you were arraigned on April 3, 1975 and you were released by the Court; do you recall that?

"A   Yes, sir.

"Q   And do you recall when being released by the Court, you had to raise your right hand and swear to keep the peace and be of good behavior?

"A   Yes, I did.

"Q   And were you warned by Judge Mackenzie what would happen to you if, in fact, you did not keep the peace and be of good behavior?

"A   Yes, sir.

MR. SCHREIBER: I will object to this line of questioning.

THE COURT: Objection sustained.

"Q   Mr. Jones, when you were, in fact, transferring the heroin to Special Agent Meade, did you have in mind the fact that you were under Indictment for a sale of drugs—delivery of drugs?

   *     *     *     *     *     *

"A   Yes, sir.

   *     *     *     *     *     *

"Q   What else would you have done because Mr. Wilkerson told you? Would you have killed somebody?

"A   No, sir.

MR. SCHREIBER: I will object.

THE COURT: Objection sustained.

MR. SCHREIBER: Your Honor, may I be heard either here or at the side bar?

THE COURT: Approach the side bar, gentlemen.

(The following occurred at side bar out of the hearing of the Jury:)

MR. LEAVEY: Your Honor, entrapment, as we all know, the State must show a predisposition to commit the offense. That because of the tone of voice of Lonnie Wilkerson, he would sell drugs. I think it's a fair question to ask, would he have sold them to a 13 or 15 year old—would he have committed a robbery or a rape—to show the fear that he had. If he says, I wouldn't kill, I wouldn't rob, I wouldn't steal, I wouldn't even speed but I would sell drugs, the Jury would be able to evaluate that to see if there is reason.

MR. SCHREIBER: The question is it's inflammatory. You're going far afield.

MR. LEAVEY: I think I have to show the reasonableness of his fear, and one way to show it is if he, for example, would say I would never shoplift because Lonnie Wilkerson told me to do that but I would sell heroin, I think the Jury could evaluate that to decide whether or not he is really telling the truth when he says he was in fear.

THE COURT: The Court will permit the line of inquiry.

(end of side bar colloquy:)

MR. LEAVEY: Would you read the question, please.

(QUESTION NUMBER 203 READ BY THE REPORTER)

MR. SCHREIBER: I have an objection, judge.

THE COURT: Objection overruled. You may answer.

"A No, I wouldn't have, sir.

"Q Would you have robbed somebody?

MR. SCHREIBER: Same objection.

"A No, sir.

THE COURT: Overruled.

"Q Would you have shoplifted a $5. item because Mr. Wilkerson asked you?

"A I may have, yes.

"Q You may have done that. So it's somewhere between a robbery and a shoplifting. Would you have broken into somebody's house because of the tone of voice of Lonnie Wilkerson in demanding that you do something.

\* \* \* \* \* \*

"A Depending on the tone of voice and the insistence on his part and how much time I would have probably to get away from that type of a situation—if I was trapped by him there in one spot and told to do it, I think I would probably have to go along with it.

\* \* \* \* \* \*

"Q Because of the tone of voice of Lonnie Wilkerson, would you have sold this bag of heroin to a 12-year old child?

MR. SCHREIBER: I object.

"A No, sir.

THE COURT: Objection overruled."

\* \* \* \* \* \*

"Q How old did you think Patty Meade was, sir?

MR. SCHREIBER: I object. It's the same question that was asked before—earlier, Your Honor.

THE COURT: Objection overruled.

"A To be Lonnie Wilkerson's mistress, I believe she would be at least of age.

"Q What is of age, sir?

"A Relative to his.

"Q How old did you think she was, 18, 19?

"A I thought she was in her latter 20's.

"Q At what point, sir, would you draw the line? What age of a person would you draw the line to selling heroin because of the tone of voice of Lonnie Wilkerson?

MR. SCHREIBER: I will object.

THE COURT: Objection overruled.

"A Once again, it depends on the controls that he used. If I was in a controlled situation where I had no other—alternative but to hand something from this person to that person because of someone standing there telling me to, then it would be—it would be more or less me or them.

"Q But the situation that you have now is where he's been trying to for I think three or four times over a period of weeks, sir?

"A Yes.

"Q You were in your own car, he wasn't there, you drove up—

"A Right.

"Q —in that type of a situation—

"A Yes, sir.

"Q —where would you draw the line?

MR. SCHREIBER: I don't understand that question, Judge.

THE COURT: Does the witness understand the question—Mr. Jones?

THE WITNESS: Not really, sir.

THE COURT: Maybe counsel can rephrase the question.

"Q Given the same set of facts that happened here on March 8, 1976, at what age would the buyer have to be for you to say, 'I'm not going to sell heroin to you'?

MR. SCHREIBER: That is not a fact, Judge, I object.

THE COURT: Objection overruled.

"A At any age, sir, without the force of Wilkerson, I wouldn't sell the drugs to anyone at any time at any age."

■ We believe that neither line of inquiry was an appropriate method of establishing defendant's predisposition to commit the offense. Evidence of the indictment was probative of nothing more than official suspicion of Jones's wrongdoing. Yet, that it had the potential to inflame the jury is patent. See *United States v. White*, 390 F.2d 405, 406–07 (6th Cir. 1968) (evidence of arrest). In short, the evidence of the indictment was rank hearsay unsupported by a factual basis.[2] See *Whiting v. United States*, 296 F.2d 512, 517–18 (1st Cir. 1961) (government suspicion, unsupported by facts, not admissible to prove predisposition).

■ The hypothetical questions were equally prejudicial and based on an even more speculative factual basis than the evidence of the indictment. Accordingly, the inquiry was of little relevance to the matter in issue at trial, namely, Jones's predisposition. To allow such questions could only have beclouded the issue of duress in the minds of the jury. The issue involved was whether, despite his unwillingness, Jones on this occasion was induced by the government to commit the crimes. The prosecutor's attempt to establish predisposition with this line of questioning was fraught with impermissible prejudice and had no relevance to the specific factual issue in dispute.

■ This inquiry was especially pernicious given the inability of defendant to defend against these vague unsupported accusations except by a bald denial. See *Hansford v. United States*, 303 F.2d at 226; *Whiting v. United States*, 296 F.2d at 518. The questions undoubtedly increased the prejudice injected into trial. Furthermore, the state had available other sources from which it could have produced competent evidence on this issue. See *People v. Corbeil*, 77 Mich.App. 691, 697, 259 N.W.2d 193, 196 (1977). One of the methods by which the state may prove the predisposition of the accused is with reliable evidence of defendant's voluntary participation in other drug sales. *State v. DeWolfe*, 402 A.2d at 744. In the case before us the prosecution apparently could have produced reliable and competent evidence of defendant's prior unpublished drug offenses without using the indictment, through testimony of Detective Rodriguez who allegedly took part in the cocaine delivery. Similarly the informant, Wilkerson, could have shed light on the issue of duress.

■ Of course in Rhode Island the scope of cross-examination is controlled by and within the discretion of the trial justice; he

---

**2.** A grand jury on March 3, 1975, returned indictment No. 75–309 against Jones. On August 17, 1976, Jones moved the Superior Court for a speedy trial. On April 7, 1977, six months before the trial under review began, the Superi-

or Court dismissed indictment No. 75–309. On cross-examination Jones admitted that he had been charged with delivering cocaine, but he explained that he had not been convicted.

dictates the course the inquiry will take. *See State v. O'Brien,* R.I., 412 A.2d 231, 233 (1980) (cross-examination of defendant); *State v. Hoyle,* R.I., 404 A.2d 69, 70 (1979) (prejudicial remarks). By allowing the prosecution to inquire into irrelevant matters, the trial justice allowed the state to go beyond the bounds of permissive cross-examination. *See State v. Williams,* 297 Minn. 76, 210 N.W.2d 21 (1973); *Smith v. State,* 453 P.2d 307 (Okl.Cr.1969). That this line of questioning prejudiced defendant's cause in the minds of the jury is clear. Therefore, the trial justice committed an abuse of discretion requiring reversal.

The defendant nevertheless claims that he has proven entrapment as a matter of law by introducing uncontroverted evidence of intolerable governmental inducement.[3] In this cause that question remains a matter of proof in the absence of non-prejudicial rebuttal evidence. When the defendant introduces sufficient evidence of inducement to raise the question of entrapment but the state adduces no evidence of predisposition in rebuttal, the trial justice must find as a matter of law that entrapment has occurred. However, if the state introduces evidence of defendant's predisposition, the jury must resolve the question of entrapment. *United States v. Burkley,* 591 F.2d at 915; *see State v. Gilman,* 110 R.I. at 222, 291 A.2d at 434.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the cause is remanded to the Superior Court for proceedings consistent with this opinion.

DORIS, J., did not participate.

---

**3.** *Compare Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Corcione,* 592 F.2d 111 (2d Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794, 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979) *with United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978); *Sylar v. State,* 340 So.2d 10 (Miss. 1976); *State v. Talbot,* 71 N.J. 160, 364 A.2d 9 (1976). *See United States v. Archer,* 486 F.2d 670 (2d Cir. 1973); *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971).