STATE

v.

**Albert VERRECCHIA.**

No. 99–458–C.A.

Supreme Court of Rhode Island.

Feb. 15, 2001.

378

Virginia M. McGinn, Aaron L. Weisman, Providence, for Plaintiff.

Dena L. Paolinio, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This entry in the annals of Rhode Island true-crime stories could be titled "The Ghost and the Golden Nugget Gang." The defendant, Albert Verrecchia (Verrecchia), was a member of a local criminal enterprise known as "the Golden Nugget Group" (GNG). Upon securing the cooperation of one Michael Rossi (Rossi), Verrecchia's former confederate and fellow GNG member, the police arranged for an undercover detective to pose as a gun-buying convict known as "The Ghost." After meeting with Rossi, Verrecchia saw "The Ghost," sold him some weapons, and thereby became ensnared in a sting operation that ultimately resulted in guilty verdicts against him on a variety of criminal charges. On appeal, Verrecchia challenges his multiple convictions for receiving stolen goods and for committing a host of other crimes.

First, he argues that the trial justice erred by ruling that he had no legitimate expectation of privacy in a large garage/barn (garage) that he rented. As a result of this ruling, the trial justice refused to address the merits of Verrecchia's motion to suppress the guns and other evidence seized after the police had obtained a warrant and searched the garage. In addition, Verrecchia suggests, the state deprived him of his constitutional right to

a speedy trial. He also insists that the trial justice abused his discretion by denying his motion to sever each of the sixty-nine separate charges he faced. Instead, Verrecchia posits, the trial justice should have conducted at least fifty separate trials on the sixty-nine counts of the indictment. Finally, he asserts, the trial justice erred by refusing to instruct the jury on the affirmative defenses of entrapment and duress.

For the reasons calibrated below, we hold that Verrecchia possessed a legitimate expectation of privacy in the garage he rented. Therefore, he was entitled to challenge the search of his garage and the seizure of the guns and other property the police found there as evidence of his alleged wrongdoing. Thus, we remand this case to the Superior Court for a determination of whether the garage search violated Verrecchia's constitutional rights against unreasonable searches and seizures and, if so, whether the evidence seized there should have been suppressed. We reject, however, Verrecchia's other arguments and affirm his convictions in all other respects.

## Facts and Travel

On May 9, 1996, police arrested Verrecchia and charged him with two counts of receiving stolen goods. A government-organized sting operation had culminated in Verrecchia's arrest. Rossi—his alleged partner in crime and fellow GNG member—was already imprisoned for committing other offenses. But before his most recent confinement, Rossi had participated with Verrecchia in many criminal activities. Nevertheless, to ameliorate his treatment at the hands of his captors, Rossi eventually agreed to help the police by arranging for Verrecchia to sell some of GNG's weaponry to an undercover police detective. According to Rossi, Verrecchia

served as the custodian of GNG's arsenal and would be amenable to such a proposed transaction.

Under the sting operation devised by the police, Rossi met with Verrecchia at the prison where Rossi was incarcerated. At one of these meetings, Rossi asked Verrecchia to sell various GNG weapons to a fellow inmate, nicknamed "The Ghost," who soon would be released from prison on bail. After Verrecchia agreed to do so, an undercover police detective posed as "The Ghost" and arranged over the telephone to meet with Verrecchia to buy the weapons. According to the detective, Verrecchia had been expecting his telephone call and readily agreed to a meeting to effect the sale. After Verrecchia's meeting with "The Ghost," the police arrested him for possessing two stolen guns. Based upon Rossi's testimony and other evidence they seized as a result of the sting operation,[1] the state eventually charged Verrecchia with an additional sixty-seven crimes (including racketeering, burglary, conspiracy, robbery, and receiving stolen goods).

During the approximately thirty months that he awaited trial, seven different, successive attorneys represented Verrecchia. Each of them, in turn, briefly served as his defense attorney during various pretrial periods. For sundry reasons, however, Verrecchia was unable to maintain a relationship with any one of them for very long. Thus, upon the withdrawal of each former attorney from their representation of Verrecchia, each successor counsel required a certain amount of time to review the file and to conduct various trial-preparation tasks. Inevitably, this turnover of defense counsel delayed the start of the trial. Ultimately, Verrecchia's trial began on January 12, 1999, and concluded on February 9, 1999, when the jury found him guilty of twenty-nine of the sixty-six counts he faced.[2] We address below each of Verrecchia's arguments on appeal.

1. Eventually, a grand jury indicted not only Verrecchia but also forty-two other defendants, charging them all with more than 700 criminal acts on behalf of GNG (including,

but not limited to racketeering, conspiracy, burglary, robbery and receiving stolen goods).

2. The original indictment included a total of sixty-nine counts against Verrecchia. On Jan-

## I

### Defendant's Reasonable Expectation of Privacy in the Garage

■ When we review a trial court's decision on a motion to suppress evidence seized after a police search, "deference is given to the [historical factual] findings of the trial justice, and those findings shall not be disturbed unless they are clearly erroneous." *State v. Briggs*, 756 A.2d 731, 741 (R.I.2000) (quoting *State v. Ortiz*, 609 A.2d 921, 925 (R.I.1992)).

■ To contest such a seizure of evidence as unlawful, however, the defendant must have enjoyed a reasonable expectation of privacy in the premises or property that was the subject of the search. *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978); *State v. Wright*, 558 A.2d 946, 948 (R.I. 1989). And Verrecchia bore the burden of proving that his alleged expectation of privacy was one that society would be willing to recognize as objectively reasonable. *See California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988); *Briggs*, 756 A.2d at 741. To determine whether a person's asserted privacy expectation was objectively reasonable, we have examined, among other factors, whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched. *See Briggs*, 756 A.2d at 741; *State v. Pena Lora*, 746 A.2d 113, 118–19 (R.I.2000) (holding that commercial occupancy of an automobile for a brief period was insuffi-

cient to establish a reasonable expectation of privacy); *Wright*, 558 A.2d at 949; *see also United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir.1988); *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir.1982).

■ Applying these factors to the present case, we look first to whether Verrecchia was in legitimate possession of the garage. The owner of the premises testified that he had rented it to Verrecchia under an oral agreement whereby Verrecchia paid $200 per month rent in either cash or services. According to both Verrecchia and the garage owner, Verrecchia was the exclusive lessee. Thus, when the lease began in 1992 (four years before the police searched the garage in 1996), one of the owners had provided Verrecchia with the only known set of keys to the garage. This owner kept no set of keys for himself or for any other party to use. In fact, during the entire rental period (1992–96), the owner had entered the garage only once, at Verrecchia's request, to inspect water damage. And the owner had gained access to the garage on this single occasion only after Verrecchia had opened the side door to the garage with his key. Therefore, based upon this evidence, we agree with the trial justice that Verrecchia was the legal tenant of the garage and that he enjoyed a valid possessory interest in it.[3]

Although the trial justice determined that Verrecchia controlled access to the garage through its side door, he also found that the evidence was silent with respect to Verrecchia's ability to control access to the garage through its large front doors. This lack of evidence with respect to the potential for garage access through these front doors—according to the trial justice—caused him to infer that the garage

uary 13, 1999, the trial justice dismissed two of these counts. Later, on February 3, 1999, the trial justice dismissed a third count, leaving sixty-six counts to be submitted to the jury.

3. The trial justice found that "there has been no evidence to suggest that the testimony [of the garage owner] was incredible or not wor-

thy of belief." On the contrary, the court concluded that "[the owner] rented the premises to [Verrecchia] at a monthly sum of $200 per month" and that "[t]he evidence establishe[d] that prior to [the 1996 date of the contested search and seizure, Verrecchia] had possession of the barn/garage. That he also had prior use of the garage/barn. That prior use dating back to sometime in 1992."

owners "had the ability, not only to enter into the premises [through the front doors] but also had an ability to control or exclude others from entering into that building." This inference, the trial justice concluded, left him in doubt whether Verrecchia truly possessed the ability to exclude others from entering through the front doors. Therefore, he believed, it undermined Verrecchia's contention that he had subjectively manifested a reasonable expectation of privacy with respect to the garage. Indeed, because Verrecchia failed to present evidence that would have rendered such an inference less plausible, the trial justice found that Verrecchia had failed to satisfy his burden of proving a reasonable expectation of privacy in the garage. Therefore, he concluded, Verrecchia could not contest the police search of the garage and the seizure of guns and other property that they found therein.[4] For the reasons explained below, we respectfully disagree with this conclusion.

■ As a general rule, "[a]n unauthorized entry or intrusion by a landlord on the tenant's premises constitutes a trespass to the same extent as an entry or intrusion by a stranger." 49 Am.Jur.2d *Landlord and Tenant*, § 485 at 402 (1995).[5] Thus, as a commercial tenant in good standing (the record does not indicate that Verrecchia had violated any of his lease arrangements), Verrecchia enjoyed a possessory interest in the garage during the life of his tenancy that gave him the right to maintain an ejectment or trespass action against the landlord for any unauthorized entry upon the leased prem-

ises. Indeed, even if he had failed to pay rent when it was due, none of the owners or landlords could enter upon or repossess the premises by utilizing "self-help" to do so. *See* G.L.1956 § 34–18.1–15 (prohibiting landlord from utilizing "self-help" to repossess leased premises). Therefore, even assuming that any of the owners had retained keys to the front doors of the garage (no evidence, however, suggested this was so), Verrecchia still would have had the ability to exclude these owners from the leased premises and from using the garage during his tenancy. If any one or more of them had attempted an unlawful entry, Verrecchia would have been entitled to obtain equitable relief to enjoin such activity or to oust them from the premises as trespassers. Thus, Verrecchia's valid possessory interest and legal right to exclude the owners and lessors (or anybody else) from his leased premises, we hold, gave rise to an objectively reasonable expectation of privacy in the leased garage.

Moreover, after the trial justice denied Verrecchia's motion to suppress, a garage owner testified that no one possessed any keys to the front doors because no such keys existed. And the uncontested testimony of this owner further undermined any conclusion that Verrecchia lacked the ability to control or exclude the owners or others from using the garage. The owner swore that he had entered the garage only once between 1992 and 1994, and then only at the request of and with the consent of Verrecchia. And his lone entry was not a

---

4. Two police officers testified that, after they had arrested Verrecchia on May 9, 1996, and while he was in their custody, he voluntarily provided them with the keys to open both the garage and a locked "coffin" therein that contained stolen weapons. Whether Verrecchia in fact voluntarily delivered the garage keys to the police, as the detectives testified, and whether this delivery constituted consent on Verrecchia's part to a search of the garage and the "coffin" containing the guns, were issues that were not raised or addressed at the trial. Therefore, we have no occasion to review them on this appeal.

5. There are certain well-defined exceptions to this general rule (for example, in an emergency a landlord may be allowed to enter to make repairs to prevent waste). *See* 49 Am. Jur.2d, *Landlord and Tenant* § 486 at 403 (1995). In this case, the landlord testified that the only time he entered the garage was to check on water damage, but even then he entered only with the permission and in the company of Verrecchia.

clandestine and unauthorized intrusion, but rather an invited entrance through the side door after Verrecchia had let him in with his key.

The mere fact that Verrecchia apparently provided duplicate garage keys to four other persons of his choosing and then allowed them to have access to the premises also did not detract from his legitimate expectation of privacy ·in the garage vis-à-vis all others, including the police. Even though Verrecchia may have shared consensual access to the garage with certain other persons, he at no time became joint tenants with them. Thus, he remained in control as the sole tenant of the garage, and he retained the power to terminate the key holders' consensual access to the garage at any time.[6] "[A]n individual need not maintain absolute personal control (exclusive use) over an area to support his expectation of privacy"—as long as that individual retains some ability to control or exclude others from using the area. *United States v. Horowitz,* 806 F.2d 1222, 1226 (4th Cir.1986); *see also Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154, 1159–60 (1968) (holding that exclusive access to an office or to documents contained with an office is not a prerequisite to invoking Fourth Amendment protection). We have also allowed a defendant to challenge the search of a car, though he did not own or exclusively control the car but merely possessed it temporarily with permission from its owner. *Compare State v. Milette,* 702 A.2d 1165, 1166–67 (R.I.1997) (holding that defendant possessed a legitimate expectation of privacy in a vehicle he drove regularly that was owned by his father, who had provided him with his own set of keys, and who had given him permission to use

it whenever he needed to do so) *with Pena Lora,* 746 A.2d at 118–19 (holding that defendant's operation of a motor vehicle with the owner's permission for a commercial purpose during a brief period failed to establish a reasonable expectation of privacy with respect to packages on the back floor of the vehicle).

Therefore, we conclude, Verrecchia satisfied his burden of proving that he possessed an objectively reasonable expectation of privacy in the garage and that the trial justice erred in precluding him from challenging the search and seizure of these premises. Consequently, we remand this case to the Superior Court for a hearing on Verrecchia's motion to suppress so that the court can determine whether the police violated any of Verrecchia's constitutional rights by searching his garage and by seizing certain property found therein as evidence of his criminal acts.

## II

### Speedy Trial

Verrecchia next argues that the state deprived him of a speedy trial.[7] To evaluate this assertion, we apply the four-part test enunciated in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972): namely, " '(1) the length of the delay, (2) the reason for delay, (3) the defendant's assertion of his [or her] rights, and (4) the prejudice to the accused.' " *State v. Austin,* 731 A.2d 678, 683 (R.I.1999). "The determination of whether the right to a speedy trial has been violated requires the weighing of each factor, with no single one being wholly dispositive." *Id.* (quoting *State v. DeAngelis,* 658 A.2d 7, 11 (R.I.1995)).

6. The garage owner testified that he knew Verrecchia was sharing the space with others but that "it [the rental agreement] was still his [Verrecchia's] obligation * * * [and] the agreement was still between he and I."

7. Article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the

United States Constitution guarantee defendant's right to a speedy trial. *See State v. Austin,* 731 A.2d 678, 683 (R.I.1999); *see also State v. Fortier,* 427 A.2d 1317, 1321 (R.I. 1981) (affirming that "[t]he right to a speedy trial is a fundamental one, and it applies to the states through the Fourteenth Amendment").

■ The first part of the test (length of the delay) is a threshold consideration that triggers review of the remaining factors—but only if the delay is long enough to be considered "presumptively prejudicial." *Austin*, 731 A.2d at 683. The trial court found, and the state concedes, that the twenty-nine months that elapsed from the time of Verrecchia's indictment until his trial was "presumptively prejudicial." *See State v. Tarvis*, 465 A.2d 164, 175 (R.I.1983) (cautioning the bar that in future cases this Court "may draw the line regarding 'presumptively prejudicial' delay at twelve months in the absence of special circumstances"). But in considering the reasons for the delay, we agree with the trial justice that Verrecchia was "responsible, either through his own actions or through the actions of his attorneys * * * [for] almost [all], if not all, of the delay."

■ *Barker* requires us to balance the relative culpability of the parties who caused the delay. *Barker*, 407 U.S. at 530–31, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. Here, the record supports the trial justice's finding that Verrecchia "through his own acts, of his own volition, [had] taken steps—numerous steps which [had] impeded the ability of this matter to proceed to trial." During the twenty-nine months between his arraignment and trial, seven successive attorneys represented Verrecchia, and each new lawyer that Verrecchia engaged to represent him required time to review the case and to prepare for trial. Although the state moved for and obtained several continuances, it was not primarily responsible for causing the long delays in the case, most of which were attributable to Verrecchia's churning through the various attorneys who represented him. Therefore, we agree with the trial justice that Verrecchia himself was largely responsible for the delay in his trial.[8]

With respect to the fourth *Barker* factor,[9] there was no specific showing in the record of any demonstrable prejudice. Verrecchia suggests that because he was denied a speedy trial, he suffered severe anxiety and mental strain caused by his long incarceration and that, as a result, he was unable to prepare his defense adequately. We have held, however, that "to the extent that incarceration disrupts one's freedom, employment, and familial associations, * * * this disruption merely constitutes a prejudice inherent in being held while awaiting trial." *State v. Austin*, 643 A.2d 798, 801 (R.I.1994). Thus, such a disruption is "insufficient to satisfy the fourth *Barker* factor." *Id.* Moreover, Verrecchia's incarceration was not even wholly attributable to the charges at issue in this case because he was also being held concurrently on a probation violation and on federal criminal charges.

Finally, Verrecchia contends that important alibi witnesses died or suffered memory loss during the pretrial waiting period, thereby prejudicing his defense. But he failed to identify them during the pretrial discovery phase of this case and he has never provided anything other than idle speculation in support of his contention that they would have been key witnesses at his trial. Thus, like the trial justice, we

8. Verrecchia, of course, disagrees with this conclusion, arguing that it was unfair to force him to choose between his constitutional right to counsel and his constitutional right to a speedy trial. But Verrecchia possessed no constitutional right to plow through a succession of lawyers until he found one whom he deemed suitable, nor was he entitled to change lawyers as frequently as some people change their socks. According to Verrecchia, delays caused by legitimate changes of legal counsel should not be counted when determining the cause of delay under a *Barker* analysis. But if we were to exclude the delays caused by Verrecchia's frequent changes of counsel, the "presumptively prejudicial" delay under the first factor of the *Barker* analysis would evaporate. *See Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972).

9. Because Verrecchia filed three motions for a speedy trial, it is undisputed that he asserted his right to a speedy trial and, thus, he satisfied the third *Barker* factor.

are unconvinced that these unnamed alibi witnesses were ever critical to Verrecchia's case.

Therefore, having concluded that Verrecchia was primarily responsible for his trial's delay and that no cognizable prejudice resulted to him from this delay, we hold that the trial justice did not err when he denied Verrecchia's motion to dismiss for lack of a speedy trial.

### III

### Motion to Sever

Verrecchia next argues that we should reverse the trial justice's denial of his motion to sever each of the sixty-nine counts against him. *See* Super. R.Crim. P. 14.[10] Verrecchia contends that the court should have required the state to conduct at least fifty separate trials on the sixty-nine counts of the indictment. He asserts that he was unduly prejudiced by the joinder of these counts in one trial and that the jury was confused unnecessarily when he had to defend against all sixty-nine counts in a single trial. Specifically, he asserts that the "overwhelming number of charges prejudice[d] him in the eyes of the jury who would naturally attribute some guilt to [him] because of the number of counts." In addition, he suggests, because of the complexity and volume of the information relating to each count, the jury returned inconsistent and conflicting verdicts, reflecting its confusion about the charges. According to Verrecchia, the only way to explain the jury's verdicts (finding him guilty of the conspiracy counts but not guilty of the robbery or

burglary counts)—especially in light of Rossi's testimony—was that the multiple counts confused the jurors. Verrecchia posits that "[i]t is incomprehens[ible] that the jury could disbelie[ve] Rossi's testimony as to the burglaries yet believe[ ] in the conspiracy when there was no separate or different testimony or evidence introduced," that specifically implicated him in a conspiracy.

We begin our analysis of Verrecchia's severance arguments by noting that "a defendant is not entitled to a severance as a matter of right." *Tarvis*, 465 A.2d at 172. Rather, the granting or the denial of a defendant's motion to sever lies within the sound discretion of the trial justice. *See id.* "To prevail in demonstrating that a trial justice has abused this discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." *State v. Humphrey*, 715 A.2d 1265, 1277 (R.I.1998) (quoting *State v. Eddy*, 519 A.2d 1137, 1140 (R.I.1987)).

Moreover, the mere fact that the jury found Rossi's testimony sufficient to convict Verrecchia of conspiracy yet insufficient to convict him of robbery or burglary does not support Verrecchia's contention that the jury was confused or that the verdicts were contradictory or inconsistent. Indeed, even if the jury had accorded different weight to the credibility or probity of Rossi's testimony depending on the charge they were considering, it would have been within its right to do so.[11]

---

10. Verrecchia does not appear to dispute that, in the first instance, the state permissibly joined these counts in the indictment under Rule 8(a) of the Superior Court Rules of Criminal Procedure. Rule 8(a) provides that "two (2) or more offenses may be charged in the same indictment, information, or complaint * * * if the offenses charged * * * are of the same or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Although Verrecchia faced

numerous counts of alleged wrongdoing, they all related to his involvement in GNG, a criminal enterprise allegedly responsible for, among other misdeeds, numerous burglaries and robberies. Moreover, the same evidence largely supported these charges, including the testimony of the state's primary witness and the guns seized from defendant, his tow truck, and the contents of his garage.

11. In fact, the jury could have found Rossi's testimony entirely credible but still convicted Verrecchia only of conspiracy instead of rob-

When assessing the probative value of a witness's testimony, "the jury is always free to accept, to reject, or to accord any amount of weight it chooses to that [witness's] testimony." *State v. Bertram*, 591 A.2d 14, 25 (R.I.1991).[12]

Furthermore, there was nothing inconsistent in the jury's verdicts of guilty on the lesser charges of conspiracy but not guilty on the substantive charge of robbery. *See State v. Hewes*, 666 A.2d 402, 403 (R.I.1995) (acquitting the defendant of murder and convicting him of conspiracy to murder). In *State v. Romano*, 456 A.2d 746, 764 (R.I.1983), this Court stated:

> "Whenever we have considered the issue of verdict inconsistency, we have subscribed to the sentiments expressed in *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358–59 (1932), where Justice Holmes observed that verdict consistency is not sine qua non because each count of an indictment is to be considered as a separate verdict. * * * [L]ogically inconsistent verdicts will be upheld as long as the verdicts are legally consistent. As we have emphasized in the past, a jury must be afforded broad power to arrive at inconsistent verdicts of acquittal and conviction through its traditional power to compromise, whether the compromise reached is motivated by a desire to show leniency or by some other consideration."

*See also State v. Allessio*, 762 A.2d 1190, 1191 (R.I.2000) (following *Dunn*). Because Rossi's testimony described Verrecchia as having played a secondary rather than a principal role in most of the GNG burglaries (he usually served as a lookout, as the getaway car driver, and/or as the supplier of weapons), the jury's verdicts (finding defendant guilty of conspiracy charges but not robbery or burglary on

most counts) were not only legally sound but also logically consistent.

Therefore, because Verrecchia offered no further evidence to support his alleged entitlement to a severance, we conclude that he suffered no substantial prejudice from the denial of this motion and that the trial justice did not abuse his discretion in doing so. In addition, Verrecchia's suggested solution of holding at least fifty separate trials on each of the sixty-nine different counts was so unwieldy and impractical an option as to cry out for a more economical and efficient alternative. In this case, joining all charges for a single trial, we hold, did not prejudice the defendant's right to a fair trial.

## IV

### Refusal to Instruct Jury on Entrapment

Verrecchia also argues that the trial justice erred by refusing to instruct the jury on the affirmative defense of entrapment. A defendant is entitled to a jury instruction on this defense if he or she has established that (1) the government induced the crime, and that (2) he or she lacked the predisposition to engage in the criminal conduct. *See State v. Jones*, 416 A.2d 676, 679 (R.I.1980); *see also Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54, 61 (1988). The defendant has the burden of producing "some evidence" on both elements that would be "sufficient to raise a reasonable doubt as to whether he 'was an "unwary innocent" rather than an "unwary criminal." ' " *United States v. Hernandez*, 995 F.2d 307, 313 (1st Cir.1993) (quoting *Mathews*, 485 U.S. at 63, 108 S.Ct. at 886, 99 L.Ed.2d at 61); *see also Jones*, 416 A.2d at 679. A court assessing the sufficiency of the defendant's presentation on this score (that is, whether "some evidence"

---

bery or burglary based upon the sufficiency of the evidence with respect to the different elements of each crime.

**12.** Although our statement in *State v. Bertram*, 591 A.2d 14, 25 (R.I.1991), was directed to expert-opinion testimony, the principle applies equally in cases involving lay-witness testimony like Rossi's.

has been adduced) must be able to find more than a scintilla of support to justify such an instruction. Rather, the court must be able to conclude that some evidence indicated that the government went beyond merely soliciting the defendant to participate in a criminal opportunity. Indeed, such evidence must be capable of supporting a determination that the police, by their actions, turned defendant from "a righteous path to an iniquitous one." *United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987); *see also Jones*, 416 A.2d at 679. Thus, courts have found sufficient evidence of entrapment when the government's inducement included "threats, forceful solicitation and dogged insistence, playing upon sympathies or the past relationship of a war buddy, and repeated suggestions at a time when defendant had lost his job and needed money." *United States v. Joost*, 92 F.3d 7, 12 (1st Cir.1996). In sum, only after the defendant has satisfied the burden of showing "some evidence" that a government agent corrupted him in this manner will the burden of disproving entrapment shift to the government. *See United States v. Pratt*, 913 F.2d 982, 988–89 (1st Cir.1990); *see also Jones*, 416 A.2d at 679.

Verrecchia suggests that both Rossi's testimony and that of the undercover police detective who purchased weapons from him provided sufficient proof that the state entrapped him. The undercover police detective testified that, after learning of Verrecchia's role as the keeper of GNG's weapons, he asked Rossi (then a government informant) to arrange for Verrecchia to sell some of GNG's weapons to an undercover police detective. Rossi testified that in a series of conversations with Verrecchia, he instructed him to sell some of the group's weapons to a fellow inmate, called "The Ghost," who would soon be released on bail. According to Rossi, Verrecchia readily agreed to do so. Thereafter, the detective testified, he contacted Verrecchia and identified himself as "The Ghost." The police recorded this conversation on tape. The detective recalled that

Verrecchia said he had been expecting his call. He recounted that Verrecchia readily agreed to meet with him to discuss the proposed weapons sale. When they met, Verrecchia asked the detective to be more specific concerning the weapons he wished to buy because Verrecchia claimed to have a "coffin" full of weapons to choose from. Later that day they met again, but after Verrecchia delivered the weapons to the detective, the police immediately arrested him.

Verrecchia avers that this testimony—combined with evidence indicating that he had no criminal record or documented history of possessing weapons or dealing in them—satisfied his burden of showing "some evidence" that the state induced him to commit a crime for which he had no predisposition.

We disagree. In this case, the state did no more than merely offer Verrecchia the opportunity to commit a crime. No evidence suggested that the police had argued or pleaded with Verrecchia or had acted with "such zeal in pursuing a conviction that [their] efforts result[ed] in the commission of a crime that likely would not have occurred if the suspect had been left to his own devices." *Joost*, 92 F.3d at 12 (citing *Jacobson v. United States*, 503 U.S. 540, 553–54, 112 S.Ct. 1535, 1543, 118 L.Ed.2d 174, 187 (1992)). Moreover, "[a] 'sting' operation is not improper inducement if it merely provides an opportunity to commit a crime, but proof of opportunity plus 'something else' may be adequate to meet a defendant's burden." *Id.* Here, Verrecchia offered no proof of any heavy-handed inducements by the government that would have elevated the state's mere invitation for Verrecchia to commit a crime into "something else." *Id.* In fact, the record indicates that he already possessed the stolen property *before* the police devised the "sting" operation. Thus, apart from its role in revealing a preexisting disposition to commit the challenged crimes, the government had nothing what-

soever to do with Verrecchia's possession of the stolen weapons.

Because Verrecchia failed to prove the type of overbearing inducement needed to satisfy the first prong of the *Mathews* test, any consideration of his predisposition would be "virtually academic." *Pratt,* 913 F.2d at 990 (quoting *United States v. Polito,* 856 F.2d 414, 417 n. 3 (1st Cir.1988)). Nevertheless, even assuming that Verrecchia had shown improper inducement to *sell* stolen property, the evidence clearly established that he was predisposed to *possess* stolen property.[13] When the police arrested Verrecchia he was wearing a stolen leather jacket and he was carrying a bag full of stolen jewelry in the vehicle he was driving. Thus, it is at best unconvincing for Verrecchia to argue that he lacked any predisposition to possess stolen property before the government induced him to do so. In fact, Rossi's testimony indicated that, long before the "sting" operation, Verrecchia had kept a large cache of weapons for GNG, all of which the police eventually determined had been stolen. Moreover, even Verrecchia's statements to the undercover police detective strongly suggested that he had possessed the stolen weapons long before the "sting" operation ever began.[14]

Therefore, because Verrecchia failed to satisfy his burden of showing that he lacked any predisposition to possess stolen property and of producing "some evidence" that the government used overwhelming tactics to lure him away from his law-abiding ways into crime, we hold that the trial justice did not err by refusing to instruct the jury on the affirmative defense of entrapment.

13. The two charges for which defendant requested an entrapment instruction involved the *possession* of two stolen weapons, but *not* the *sale* of these weapons.

14. The two counts of possession of stolen property for which Verrecchia sought entrapment instructions were based upon his possession of the two stolen weapons that he sold to the undercover police detective.

## V

### Refusal to Instruct Jury on Duress

■ Finally, Verrecchia insists that the trial justice erred by refusing to instruct the jury on the affirmative defense of duress. His involvement with the stolen weapons, he maintains, directly resulted from threats issued by the very person who set him up to make the sale: namely, Rossi—his former partner-in-crime turned government informant. Verrecchia contended that Rossi threatened him and his family with physical harm when he visited Rossi in prison, thereby forcing Verrecchia to sell stolen weapons to an undercover police officer some four days later.

■ "A duress defense has three elements: 1) an immediate threat of serious bodily injury or death, 2) a well-grounded belief that the threat will be carried out, and 3) no reasonable opportunity to escape or otherwise to frustrate the threat." *United States v. Arthurs,* 73 F.3d 444, 448 (1st Cir.1996). The failure to show any one element of duress is sufficient to justify denying a request to submit a defense theory to the jury." *See id.* at 448–49.

■ Although Verrecchia now concedes that no evidence supported a duress instruction, he argues that this is so because the trial justice erroneously excluded key testimony on this point as hearsay. One witness whose testimony the court partially excluded was Verrecchia's girlfriend, Kate Cullen (Cullen).[15] Cullen would have testified that on the day following his prison visit with Rossi, Verrecchia appeared to her to be upset and nervous.

15. The trial justice, however, permitted Cullen to testify about her personal observations of Verrecchia following his prison visit with Rossi at which Rossi allegedly threatened Verrecchia and coerced him into selling weapons.

Supposedly, Verrecchia told her that, during his prison visit with Rossi the day before, Rossi had threatened to kill both of them if Verrecchia did not sell the weapons as Rossi had demanded. Verrecchia argues that even though Cullen's testimony was hearsay, it should have been admitted pursuant to the excited utterance exception contained in Rule 803(2) of the Rhode Island Rules of Evidence because he related his statements to Cullen only one day after Rossi had threatened him. Therefore, he contends, he was still laboring under the stress of the nervous excitement when he spoke to Cullen.

■■■■ The hearsay rule does not exclude excited utterances, as that term is defined by Rule 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* An utterance need not be strictly contemporaneous with the startling event to qualify as spontaneous, "so long as it was made while the declarant 'was still laboring under the stress of [the] * * * experience.'" *State v. Krakue*, 726 A.2d 458, 462 (R.I.1999) (quoting *State v. Creighton*, 462 A.2d 980, 983 (R.I.1983)). Whether a hearsay statement is admissible as an excited utterance is left to the sound discretion of the trial justice and "any decision made by a trial justice concerning the admission of excited utterances shall not be overturned unless clearly wrong." *State v. Perry*, 574 A.2d 149, 151 (R.I. 1990).

We are unable to conclude that the trial justice was "clearly wrong" when he found that Verrecchia's statements to Cullen about Rossi's alleged threats were not excited utterances. A full day had passed after Verrecchia's meeting with Rossi before he finally told his girlfriend about it. As a result, and as the trial justice noted, Verrecchia had "an opportunity to contrive and to, perhaps, misrepresent" what had actually occurred.

Moreover, even if the court had admitted Cullen's testimony into evidence, Verrecchia still would not have satisfied his burden of justifying a duress instruction.[16] *See Arthurs*, 73 F.3d at 448–49. To do so, a defendant must produce sufficient evidence on each of the *Arthurs* elements. *See Mathews*, 485 U.S. at 63, 108 S.Ct. at 887, 99 L.Ed.2d at 61 ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find. in his favor."). Once a defendant has produced sufficient evidence to support a duress instruction, the burden shifts to the state to show beyond a reasonable doubt that a defendant's criminal acts were not the product of duress. *See United States v. Amparo*, 961 F.2d 288, 291 (1st Cir.1992). When reviewing a trial court's determination of whether a defendant has produced sufficient evidence of duress, we examine the record "most charitably to the proponent of the instruction." *Coady*, 809 F.2d at 121. But even after examining the record "most charitably" to Verrecchia, we are unable to conclude that any evidence supported his theory that he possessed the weapons in question because he was under an immediate threat of serious bodily injury or death.

---

**16.** Alternatively, Verrecchia contends that Cullen's statements should have been admitted under the hearsay exceptions defined by Rules 803(1), 803(3) or 803(24) of the Rhode Island Rules of Evidence. Because these arguments were not raised at trial, they have been waived. And for the reasons stated in the text, the exception to the raise or waive rule is not available in this case. *See State v. Donato*, 592 A.2d 140, 141–42 (R.I.1991) (recognizing an exception to the "raise or waive" rule in situations in which basic constitutional rights are implicated) ("In order for the exception to apply, however, the error asserted must go beyond the level of harmless error, the record must be 'sufficient to permit a determination of the issue,' and counsel's failure to raise the issue must be premised upon 'a novel rule of law that counsel could not reasonably have known during the trial.'").

Verrecchia contends that four days after he was threatened by Rossi—a prisoner who then, as now, remained confined behind bars—the threat was still so real and immediate to him that he was forced to possess the weapons in question. But no evidence was presented (or excluded by the trial justice) substantiating Verrecchia's claim that Rossi's tentacles extended beyond the prison walls, so that he would be capable of carrying out the alleged threatened harm. Therefore, we cannot fault the trial justice for remaining unconvinced that the alleged threat of harm to Verrecchia was any more imminent than that faced by the defendant in the *Arthurs* case.[17]

Even if Verrecchia had succeeded in convincing the trial justice that Rossi's alleged threat was sufficiently imminent, the evidence did not support the conclusion that he had no reasonable opportunity to escape or otherwise to frustrate such a threat. In addition to possessing a large cache of weapons *before* the alleged threat, Verrecchia would have had more than four days to flee from any alleged threat. Therefore, because Verrecchia did not adduce (nor did the trial justice improperly exclude) sufficient evidence to support his request for a jury instruction on duress, we hold that the trial justice did not err by refusing to provide one.

### Conclusion

For these reasons, we deny the appeal in part and sustain it in part. We affirm' Verrecchia's convictions, subject to our remand of this case to the Superior Court for a new hearing on his motion to suppress. If the motion justice concludes after conducting this hearing that the evidence should not be suppressed, he or she should enter an order to that effect and the convictions shall stand as affirmed, subject to any appeal concerning this ruling. If, on the other hand, the motion justice decides to grant the motion to suppress, then he or she shall vacate Verrecchia's convictions and conduct a new trial. The papers in this case shall be remanded to the Superior Court for further proceedings consistent with this opinion.

---

**17.** In *United States v. Arthurs,* 73 F.3d 444, 446 (1st Cir.1996), the defendant testified that, as he was leaving a cruise ship, he was pulled into a bathroom and threatened by two men who told him that they would kill him if he did not carry drugs off the ship. The First Circuit concluded that the trial justice had properly refused to instruct the jury on duress because, although the defendant may have been under an immediate threat of serious injury while he was in the bathroom, there was no such threat as he was disembarking the ship (the men allegedly released him and then disappeared). *Id.* at 449. Therefore, according to the First Circuit, the evidence did not support an immediate threat of serious bodily injury or death but "at most support[ed] a lingering threat of future harm."· *Id.*