DECISION
Defendant, Albert Verrecchia, was charged by a Providence County Grand Jury in P1/1996-2365-00 with the commission of 69 counts including receiving stolen goods. Before his trial, defendant moved to suppress evidence seized after a police search of the barn-type garage he leased. After hearing testimony from David Palmisciano, the owner of the garage, and the defendant — who leased the garage from Mr. Palmisciano — the Court ruled that defendant lacked an adequate expectation of privacy in the barn-type garage and denied his motion to suppress.
The matter proceeded to trial and defendant was convicted of 29 of 69 counts charged, including receiving stolen goods. Defendant appealed. The Rhode Island Supreme Court in State v. Verrecchia, 766 A.2d 377 (2001), held that defendant possessed a legitimate expectation of privacy in the barn-like garage he rented. The Supreme Court remanded the matter for determination as to whether or not the barn search violated Verrecchia's constitutional rights against unreasonable search and seizures and, if so, whether the evidence seized should have been suppressed.
At the hearing on remand, defendant moved, without objection, to have all testimony at pre-trial and trial court proceedings both in the United States District Court in U.S. v. Verrecchia [C.R. 97-45-ML], affirmed on appeal in 196 F.3d 294 (1999), and in this matter considered at a so-called "Franks-hearing" to establish the alleged deficiency of the affidavit submitted by a member of the Rhode Island State Police (RISP), Corporal Joseph DelPrete. Franks v. Delaware, 438 U.S. 154 (1978). Defendant asserted that the affidavit lacked an adequate showing of probable cause and that the resulting search warrant was, therefore, invalid. The search warrant and affidavit is appended to this Decision as Appendix A, p. 5.
 Facts
Following an investigation by the RISP concerning an alleged stolen property ring being operated by individuals frequenting the "Golden Nugget Pawnshop," the RISP arrested Michael Rossi. Rossi, a former associate and alleged partner in crime of the defendant who was serving time at the Adult Correctional Institute (ACI) on other charges, was encouraged by the RISP to act as a confidential informant in exchange for a lighter sentence. Verrecchia had visited Rossi in prison several times in the months leading up to the investigation focused on defendant. Based upon conversations with defendant, Rossi told the RISP that Verrecchia stored weapons in a coffin-like structure in a location unknown to Rossi. Rossi then assisted the RISP in arranging for defendant to sell stolen weapons to an undercover police detective. Rossi told Verrecchia that a fellow inmate named "The Ghost" would be released from prison and wanted to buy some weapons.
On May 6, 1996, posing as "The Ghost," undercover RISP Detective Sergeant Steven O'Donnell, in an audio taped conversation, called defendant and arranged to meet at a donut shop. Appendix B, p. 2. The conversation of the meeting which took place between Detective Sergeant O'Donnell and defendant at the donut shop was also audio taped. (Appendix C at page 1). In addition, defendant and Detective O'Donnell were being surveilled by members of RISP and the Federal Bureau of Investigations (FBI) from ground positions as well as from the air. Shortly after that meeting, Detective Sergeant O'Donnell went with the defendant to defendant's place of business in Johnston, Rhode Island, to finalize the sale of weapons. This meeting was surveilled from air. From the business defendant was observed by a surveillance team from the FBI and RISP via airplane as he drove to a barn in Burrillville, Rhode Island. The defendant was observed as he went into the barn and returned with a box which he placed in his truck before leaving. Later that afternoon, while still under surveillance, defendant returned to a previously agreed upon shopping center where he furnished Detective Sergeant O'Donnell with the weapons requested. Defendant was then arrested.
With the details of the arrest, the surveillance, and the information provided by the confidential informant Rossi, Corp. DelPrete applied for and received a warrant to search the barn from a District Court Magistrate. Upon execution of the warrant, RISP uncovered a collection of stolen weapons, ammunition, explosive materials and other related items from the coffin, or large storage bin, referred to by confidential informant Rossi during the undercover operation. Defendant challenges the veracity, credibility, and basis of knowledge of the confidential informant Rossi contained in the affidavit upon which the issuing magistrate relied. Defendant seeks to redact what he believes are factually unsupported portions of the affidavit. Defendant asserts that the remaining portions do not provide sufficient probable cause and the fruits of the search should be suppressed.
 Discussion/Overview of the Warrant Process
The Fourth Amendment safeguards citizens' privacy and security. Searches or seizures of persons or property, with certain exceptions, none of which were argued to be present here, must be reasonable and with a warrant. The affidavit is a statement sworn to by oath or affirmation. Use of the affidavit assures that the police do not determine probable cause without the aid of a disinterested third party. If the determination of probable cause were left solely to the police, possible abuse of power could arise. Johnson v. U.S., 333 U.S. 10 (1948). At the same time, the police deserve leeway in collecting and reporting information. Brinegar v. U.S., 338 U.S. 160, 176 (1949).
To be lawful, a warrant must meet three requirements: 1) it must be issued by a neutral, detached magistrate; 2) it must be presented to the magistrate with an adequate showing of probable cause — that showing supported by oath or affirmation; 3) it must describe with particularity the place to be searched or the persons to be seized.
The defendant here claims the second requirement — adequate showing of probable cause — was not shown within the affidavit. Where a defendant choose to challenge the validity of an affidavit, a rigorous review of his or her assertion must take place. Franks, 438 U.S. at 155.
In Johnson v. U.S., 333 U.S. 10 (1948), the court determined the sufficiency of an application for a search warrant. If the sufficiency of an application for arrest is questionable, the magistrate may deny issuance of the warrant sought. Franks, 438 U.S. at 165. In the alternative, the magistrate may ask for further evidence supportive of probable cause. Id. at 165. This may be in the form of additional affidavits. Once the sufficiency is met, however, there is an assumption of the affidavit's validity. Id. at 172.
If the affiant (here Corporal DelPrete) has relied on a third party for evidence, he or she must establish that third party's reliability. Aguilar v. Texas 378 U.S. 108 (1964). Here the affiant, in part, relied on a third party — confidential informant Rossi — for evidence. In Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. U.S.,393 U.S. 410 (1969), the Supreme Court established a two-prong test to determine adequacy of a showing of probable cause relying upon: 1) the veracity and credibility of the informant, and 2) the informant's basis of knowledge. Under strict application of the Aguilar-Spinelli test, if either one of these factors is insufficient, probable cause does not exist.
Furthermore, a tip should describe the crime with particularity as the constitution requires. Aguilar, 378 U.S. at 108. Unless there is a basis of knowledge from which an informant can draw a conclusion, the evidence he or she provides is insufficient in the probable cause analysis. Id.
After objection to the rigidity of the Aguilar-Spinelli test, the United States Supreme Court adopted another approach. In Illinois v. Gates, 462 U.S. 213 (1983), the majority of the court considered the "totality of the circumstances" in determining probable cause. Weakness in one prong could be overcome by strength in another. Id. at 214. As long as there was a "fair probability that contraband or evidence will be found in a particular place," the totality of circumstances test was sufficient to find probable cause. Id. at 238. Most importantly, if there is corroboration of crucial facts from another independent source, the lack of sufficiency, in any, of the prongs can be overcome. Id. at 233.
The goal of the Gates test is to protect useful evidence obtained by confidential informants from automatic rejection under more rigid tests. Id. at 232. Substantial corroboration is the basis of the State's argument against Verrecchia in this matter. The Rhode Island Supreme Court chose to adopt the rationale of Gates in State v. Ricci, 472 A.2d 291
(1984). The court held that although Aguilar-Spinelli was an important basis for the establishment of probable cause, Rhode Island had, unlike other states, always recognized the totality of the circumstances, as suggested by Gates. Id. at 296.
 A. The defendant's objection based upon the alleged invalidity of the affidavit for its failing to establish probable cause.
The defendant has moved to suppress the fruits of the search from the barn-like structure. Rossi implicated the structure in the pre-warrant conversations he had with the RISP. The defendant objects to this on the grounds that there was no actual showing of probable cause in the affidavit sworn to by Corp. DelPrete. According to the defendant, there are three problems with the affidavit: 1) inadequate showing of Rossi's reliability and basis of knowledge, 2) insufficient corroboration to overcome this lack of reliability and basis of knowledge, and 3) "deliberate falsehood and/or reckless disregard for the truth" according to the standards set forth in Franks.
Although defendant raises a number of different arguments, only one argument is persuasive but not determinative. The defendant argues, and the Court agree, that Corp. DelPrete had a duty to include information — positive or negative — which would allow the magistrate to deduce the reliability of Rossi, his confidential informant. Corp. DelPrete knew this was Rossi's first task for the RISP, so his credibility was not necessarily automatic. Corp. DelPrete also knew that Rossi had been to the barn in question but was not certain of its exact location; however, these pertinent facts were omitted from the affidavit. Until the surveillance and the arrest of the defendant, DelPrete had no way of knowing if criminal activity was still ongoing at that location. While the detective was not required to prove beyond a reasonable doubt that incriminating evidence would be present when the search was conducted, his affidavit must indicate that the evidence described is likely to be present. U.S. v. Ricciardelli, 998 F.2d 8, 10 (1st Cir. 1993). This in no way implies that the warrant in the instant case is invalid. It simply underscores the significance of the magistrate's role in determining probable cause. Ultimately the magistrate must make the determination as to whether the confidential informant and not the affiant's specificity of detail and length of experience support probable cause. See U.S. v. Vigeant, 176 F.3d 565 (1st Cir. 1999).
The defendant raises an intriguing although indirectly related argument concerning the credibility of Detective Sergeant O'Donnell, another member of the surveillance team. The defendant relies on findings in State v. Acciardo. 748 A.2d 811 (R.I. 2000), which was decided after the trial in this matter, to cast doubt on the truthfulness of Detective Sergeant O'Donnell's testimony in the instant matter. In Acciardo, the Rhode Island Supreme Court overturned the conviction of Rossi's attorney because it was found that Detective Sergeant O'Donnell and other members of the RISP lied to the attorney about Rossi and another defendant having no outstanding warrants for their arrest. Relying on that information, the defendant's attorney allowed the men to stay at his house temporarily and was charged and convicted of aiding and abetting criminals.
Based upon this holding, the defendant argues that Detective Sergeant O'Donnell's testimony in the instant matter be considered cautiously. Despite the defendant's concerns, there is no proof of perjury or suppression of evidence by Detective Sergeant O'Donnell in the instant matter. Furthermore, much of Detective Sergeant O'Donnell's testimony is corroborated by other evidence found in the transcripts of the State's proceedings. Finally, while a misstatement of the truth by any member of the RISP is something that must be taken seriously, the affiant on whose statements the relevant search warrant were based is not Detective Sergeant O'Donnell but Corp. DelPrete.
Despite the meritorious aspects of some of the defendant's argument, it is clear that the affidavit in this case did establish probable cause because the information provided by confidential informant Rossi was adequately corroborated by the RISP's investigation of the defendant. Even if the corroboration were not sufficient, a good faith exception would apply, making use of the exclusionary rule inappropriate.
 B. The independent police investigation adequately corroborated the confidential informant's information because the statements of the affiant and other members of the surveillance team were largely consistent, and the CI's tip eventually led the police to firsthand observation of the defendant's involvement in criminal activity.
Despite any deficiencies in information regarding the confidential informant Rossi, Corporal DelPrete's affidavit still established probable cause because the informant's tip was adequately corroborated by independent police work. See Gates, 462 U.S. at 243-44; Ricci, 472 A.2d at 296. Because the largely consistent statements of the surveillance officers suggest that the surveillance was performed carefully and in good faith, and because confidential informant Rossi's tips accurately led to the officers' firsthand observation of defendant's participation in criminal activity, the police investigation was sufficient. See, e.g., Gates, 462 U.S. at 243-44; Vigeant, 176 F.3d at 570; 575; State v. Connell, 324 A.2d 331 at 332 (1974).
 1. Although there were minor discrepancies in the accounts of the surveillance officers, the officials' statements were mostly consistent — suggesting that the surveillance was accurate.
Occasionally, the defendant correctly notes minor inconsistencies in the officers' accounts. However, in assessing the probity of an affidavit, courts have held that claimed misstatements not within the personal knowledge of the affiant do not go the integrity of the affidavit. Franks, 438 U.S. at 163 (quoting Rugendorf v. U.S.,376 U.S. 528, 532 (1964)). Furthermore, as the State notes in its memo and an independent review of the affidavit and trial testimony reveals, many of the defendant's arguments regarding supposedly inconsistent statements are inaccurate. Lastly, most of the statements of the officers at hearing and trial and those in the affidavit regarding the key parts of the surveillance conformed to each other — suggesting that the surveillance was accurate.
To start, the defendant alleges an inconsistency between RISP Detective Richard Ryan's trial testimony that he did not see defendant carry anything out of Eastern Automotive (Fed. Ct. Trial Trans., p. 89), and the affidavit, which alleges that the defendant was observed carrying something out of the business. (Defendant's memo, p. 4.) In actuality, the affidavit merely states that ". . . members of the . . . surveillance team observed [defendant] leave . . . Eastern Automotive and Auto Body then place a cardboard box into the tow truck." Appendix A, p. 8. According to Detective Sergeant O'Donnell's trial testimony, there were "at least 10" members of the surveillance team. (Sup. Ct. Trial Trans., p. 364). Nothing in the affidavit suggests that it was Detective Ryan, and not other members of this 10-person surveillance team on the ground and in the air that day, who observed the defendant carry something out of his business. As the State argues in its memo, it must be remembered that in preparing the affidavit, Corporal DelPrete relied on the observations of several surveillance team members, not only on those of Detective Ryan. (State's memo, p. 15.)
Next, the defendant alleges an inconsistency between the affidavit and trial testimony on the subject of whether or not the defendant was observed carrying a box from his tow truck to the barn when arriving there after leaving Eastern Automotive. (Defendant's memo, p. 4-5.) Citing "St.T.p.89" [actually Fed. Ct. Trial Trans., pp. 71-72; 89-90], the defendant asserts that Detective Ryan stated that he saw the defendant enter the barn empty-handed and come out with a box. In contrast to this trial testimony, argues the defendant, the affidavit states that the surveillance team observed the defendant removing a box from his tow truck, bringing it into the barn, and exiting the barn with the same box a few minutes later. (Appendix A, p. 9). In fact, there is no real discrepancy between Detective Ryan's trial testimony and the affidavit. Detective Ryan testified that he did not observe the defendant at any point carrying anything from the tow truck to "someplace else" other than the barn. (Fed. Ct. Trial Trans., p. 90.) Detective Ryan also testified that he did not see the defendant carry anything from the tow truck into the barn when the defendant originally entered it. (Fed. Ct. Trial Trans., p. 89.) But Detective Ryan did not testify that he never observed the defendant carry anything from the tow truck to the barn. The question was never asked. (See Sup. Ct. Trial Trans., pp. 452; 506-07; Fed. Ct. Trial Trans., pp. 71-72; 89-90.) Even if it can be inferred from his testimony that Detective Ryan never saw the defendant carry anything from his tow truck to the barn, it again must be remembered that Corporal DelPrete prepared the affidavit based on the observations of several surveillance team members, not solely on those of Detective Ryan. (Sup. Ct. Trial Trans. p. 1271-72.) It is also significant that Detective Ryan's trial testimony matches perfectly with the rest of the observation in the affidavit — that defendant took a box from the barn and placed it in his tow truck. (Fed. Ct. Trial Trans., p. 71-72; Appendix A, p. 9.)
Citing testimony at Fed. Ct. Trial Trans., p. 71, the defendant next argues that Detective Ryan "couldn't identify who exited the truck and entered the barn." (Defendant's memo, p. 5.) While this is correct, it does not accurately capture the gist of Detective Ryan's trial testimony. Detective Ryan did testify that he was unable to observe the face of the person exiting the tow truck and entering the barn. (Fed. Ct. Trial Trans., p. 71.) However, Detective Ryan also testified that the person exiting the tow truck and entering the barn was wearing the same clothing as the person the Detective had observed meeting with Detective Sergeant O'Donnell in the Dunkin' Donuts parking lot less than an hour earlier. (Fed. Ct. Trial Trans., p. 71.)
As further evidence of the surveillance's madequacy, defendant directs the Court to testimony at Sup. Ct. Trial Trans. p. 498 to argue that while the affidavit gives specific times of observations, "Ryan testified that there were no notes or records made of the observations." (Defendant's memo, p. 5.) However, the transcript reveals that Detective Ryan merely testified that he made no notes or records, not that no member of the surveillance team did so. (Sup. Ct., Trial Trans. p. 498.) While there is some dispute between the parties about whether or not FBI Agent Brazen maintained surveillance notes, there is no evidence to contradict the exact times quoted in the affidavit.
Again questioning the surveillance's accuracy, the defendant suggests that there is a discrepancy between the testimony of Detective Ryan and Detective Sergeant O'Donnell concerning the color of the box the defendant carried. (Defendant's memo, p. 5.) According to the defendant, Detective Ryan testified that the box was white, while Detective Sergeant O'Donnell maintained that the weapons were "handed . . . to "The Ghost' in a green box and a red box." (Defendant's memo, p. 5.) As the State points out in its memo at p. 16, this characterization of the trial testimony is incomplete. Detective Sergeant O'Donnell actually testified that the box was ". . . multicolored, I think red, green, white." (Sup. Ct. Trial Trans., p. 383.)
Further arguments concerning the accuracy of the surveillance from defendant's response memorandum are similarly unpersuasive. Defendant is correct in asserting that he never said during the audio taped telephone conversation that he was "waiting for a telephone call from `The Ghost'" or that he was "receptive to do business." (Defendant's response memo, p. 2.) However, the affidavit never claims the defendant spoke these words — only that through the course of conversation, the defendant acknowledged these things to be true. (Appendix A., p. 6.)
Finally, both of the defendant's memos question the surveillance officers' ability to make careful observations from a distance of 2000 feet in the air with only regular binoculars as visual aids. To be precise, Detective Ryan actually testified that the air surveillance was conducted from between 1500 and 2000 feet. (Sup. Ct. Trial Trans., p. 449, 451.) More importantly, however, the defense offers no evidence to show why the air surveillance officers would be unable to see from that distance with regular binoculars. Furthermore, the argument ignores the fact that, according to RISP Detective Palmer's testimony, ground surveillance was conducted in addition to air surveillance that day. (Sup. Ct. Trial Trans., p. 1156-57.)
 2. The surveillance was adequate corroboration because it served to confirm information offered by confidential informant Rossi and led to police officers' firsthand observation of the defendant's participation in criminal activity.
The surveillance both confirmed confidential informant Rossi's information and led to the officers' own observation of the defendant's criminal activity, factors that indicate corroboration is sufficient. See, e.g., Gates, 462 U.S. at 242-44; Vigeant, 176 F.3d at 570, 575; Ricci, 472 A.2d at 297. Courts are likely to find corroboration adequate when an informant's tip about a defendant's alleged criminal behavior both turns out to be accurate and leads the police to witness the defendant participating in activity consistent with the informant's theory. See id. In Connell, the court held that the affidavit in question did not establish probable cause that a particular residence was being used as an illegal gambling house, in part because the independent police investigation did not adequately corroborate an informant's tip. See 324 A.2d at 332. The corroboration was implicitly held insufficient, partly because although the tip led to a police officer allegedly placing an illegal bet with the defendant over the phone, no member of the force ever became an eye witness to any criminal activity. See id. Similarly, in Vigeant, the court found there was no probable cause to support a warrant in part because although officials had conducted extensive surveillance of the defendant's home, nothing in the affidavit suggested that this independent investigation confirmed any of the conclusory information found in the affidavit. 176 F.3d at 570, 571.
In contrast, the court in Gates found probable cause when an informant's tip about the defendants' drug trafficking movements were verified by police officers who later witnessed the defendants participating in activities consistent with those the confidential informant had predicted would occur. 462 U.S. at 243. Likewise, the court in State v. Germano, 559 A.2d 1031, 1035 (R.I. 1989), found probable cause because the informant's tips concerning the defendant's telephone number and criminal record were verified by independent police investigation, and the lead detective later witnessed activity consistent with the informant's theory that defendant was dealing drugs. In both Gates and Germano, the corroboration was deemed sufficient in spite of the fact that the police never witnessed the criminal activity itself — only suspicious behavior consistent with the informants' opinions that the defendants were performing criminal acts. Gates, 462 U.S. at 226; Germano, 559 A.2d at 1032-34.
The fact pattern of defendant's case stands in contrast to those of Connell and Vigeant. Unlike the police investigations conducted in Connell and Vigeant, the police investigation in this case resulted in firsthand, eye witness observation of the, defendant engaged in criminal activity. See Vigeant, 176 F.3d at 575; Connell, 324 A.2d at 332. The events of this case more closely resemble the Gates and Germano models — and arguably, the results of this independent police investigation are even more incriminating. See Gates, 462 U.S. at 244; Germano, 559 A.2d at 1032-34. Like those in Gates and Germano, the surveillance in the instant case confirmed information given to the police by the confidential informant. See id. For example, confidential informant Rossi told the police that he had contacted defendant and set up the preliminary stages of the sting operation by alerting defendant that someone named "The Ghost" would be calling in order to purchase firearms. (Appendix A, p. 6.) When Corporal O'Donnell called the telephone number confidential informant Rossi had offered as defendant's business line, defendant answered the phone. (Appendix A, p. 6; Appendix B, p. 2, line 8.) When Corporal O'Donnell identified himself as "The Ghost" and asked if defendant was expecting his call, defendant answered "Yep." (Appendix B, p. 2, line 12.) The surveillance even went beyond those performed in Gates and Germano, in that it led the police not only to witness the defendant behaving in ways consistent with the criminal activity described by the confidential informant, but to actually catch defendant carrying out that criminal activity. See Gates, 462 U.S. at 244; Germano, 559 A.2d at 1032-34.
It is well established that the standard of review of a magistrate's probable cause determination is one of great deference. Spinelli v. U.S., 393 at 419. In light of the fact that a judicial officer is entitled to draw all reasonable inferences from the statements in the affidavit in order to make a common sense determination that evidence is likely to be located in a particular place, the defendant has not shown cause why that standard should be overcome here. See Gates, 462 U.S. at 230; Spinelli, 393 U.S. at 419; State v. Ricci, 472 A.2d at 297.
 C. Even if the warrant was improperly issued, a good faith exception should apply and the evidence should not be suppressed because the defendant has not shown that the affiant knowingly or recklessly disregarded the truth.
The Fourth Amendment exclusionary rule, as it was first established in Weeks v. U.S., 232 U.S. 383, 398 (1914), was used to suppress evidence obtained from a past unlawful search or seizure in federal prosecutions. In Mapp v. Ohio, 367 U.S. 643, 655 (1961), it was determined that the exclusionary rule should also be applied by state courts to suppress evidence obtained from illegal search and seizures. Later, U.S. v. Leon,468 U.S. 897, 922 (1984) established an exception to this exclusionary rule. That court determined that a good faith exception may be granted on the basis of a police officer's objective good faith belief that a magistrate's probable cause determination was properly made pursuant to a truthful warrant affidavit, even if the warrant is later deemed defective. 468 U.S. at 922.
Because suppression of evidence is a judicial remedy used to deter official misconduct, its remedial objectives would not be served were it used when police officers had acted in good faith. Id. at 908. Therefore, the exclusionary rule should only be applied when the benefits of excluding evidence obtained in reliance on a search warrant later held to be defective will outweigh the costs. Id. at 907. As long as searching officers have acted in objectively reasonable good faith reliance on a warrant, the balance tips in favor of applying the good faith exception to the exclusionary rule. See id. The Leon court determined that reliance on a warrant would not be objectively reasonable in certain circumstances, including situations in which the issuing magistrate had been misled by information in the affidavit that the affiant knew or should have known was false except for his reckless disregard of the truth. Id. at 923.
In an attempt to show that the affiant recklessly disregarded the truth so as to merit imposition of the exclusionary rule, the defendant has pointed specifically to the affidavit and trial testimony to prove that portions of the affidavit were patently false. However, as demonstrated in section B1 of this Decision, the defendant has pointed to only a few legitimate discrepancies, none of which shed significant doubt on the larger number of consistent statements made in the affidavit and at trial. As such, these discrepancies do not appear to rise beyond the level of minor transgression that the Leon court declared should be exempt from the exclusionary rule. See id. at 908.
The defendant also suggests that the omissions regarding confidential informant Rossi's character, criminal record, and pending deal for a reduced sentence in exchange for the information he supplied, are evidence that the affiant intentionally misled the magistrate. (Defendant's memo, p. 6.) Relying on the Vigeant court's assertion that a confidential informant's known unreliability should be incorporated into an affidavit even when independent corroboration exists, the defendant argues that omitting such information evidences a lack of good faith. Vigeant, 176 F.3d at 573, fn. 9; see Defendant's memo, p. 6. However, Vigeant's propositions must be read within the context of the facts of that case. In Vigeant, the affiant's failure to include information about the confidential informant's reliability was one factor in a long list of missteps suggesting bad faith on the officer's part. 176 F.3d at 573-74. That affiant also left out other relevant, exculpatory facts, alluded to evidence that did not exist, and falsely suggested he had witnessed criminal activity. Id. While the defendant in the instant case raises important questions about Corporal DelPrete's failure to disclose information about confidential informant Rossi's character and reliability, it appears that unlike the affiant's blunders in Vigeant, Corporal DelPrete's omissions were the only arguably problematic aspect of his affidavit. See id. As such, they — like the minor discrepancies between the affidavit and trial transcript discussed above — appear to fall outside of the category of major transgressions with which the exclusionary rule is concerned. See Leon, 468 U.S. at 908.
 Conclusion
For the reasons stated above, the defendant's motion to suppress is denied. The evidence seized from the barn leased by defendant was not illegally seized in violation of his rights secured under the Fourth Amendment.